UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| DANIEL AVILA, | No. CV 17-02701-SJO (DFM) |
| Plaintiff, | |
| v. | MEMORANDUM AND ORDER DISMISSING FIRST AMENDED COMPLAINT WITH LEAVE TO AMEND |
| LOS ANGELES COUNTY SHERIFF'S DEPARTMENT et al., | |
| Defendants. | |

**I.**

**BACKGROUND**

On April 10, 2017, Daniel Avila ("Plaintiff"), a prisoner at California State Prison in Corcoran, California, filed a pro se civil rights action under 42 U.S.C. § 1983. Dkt. 1 ("Complaint"). He also filed a "Complaint Memo for Extra Space," Dkt. 4, which the Court deemed part of the Complaint. The Court screened the Complaint and dismissed it with leave to amend. Dkt. 7. On June 9, Plaintiff filed a First Amended Complaint. Dkt. 9 ("FAC"). In accordance with 28 U.S.C. §§ 1915(e)(2) and 1915A, the Court must screen the FAC to determine whether the action is frivolous or malicious; fails to state a

claim on which relief might be granted; or seeks monetary relief against a defendant who is immune from such relief.

## II.
## DEFENDANTS

Plaintiff has removed some defendants from his suit but added others. He continues to name as defendants in their individual capacity: (1) Blake Orlandos, Los Angeles Sheriff's Department ("LASD") Deputy; (2) Sunny Solomua, LASD Deputy; (3) Jesus Rojas, LASD Sergeant or Deputy[1]; (4) Patrick Allen, LASD Deputy; (5) Frank Quintana, LASD Deputy; (6) Cecilio Felix, LASD Deputy; (7) Ralph Ornelas, LASD Captain/Commander or Deputy; (8) A. Machado, LASD Deputy; (9) C. Nguyen, LASD Deputy; (10) Edwin Alvarez, LASD Lieutenant/Watch Commander or Deputy; (11) L. Chavez, LASD Sergeant or Deputy; (12) S. Haley, LASD Deputy; (13) S. Glynn, LASD Sergeant or Deputy; (14) G. Campos III, LASD Deputy; and (15) Bruce Yoell, Sergeant or LASD Deputy. Id. at 2-9. He adds as defendants in their individual capacity: (16) Gregory Taylor, LASD Sergeant or Deputy; (17) Paul Peitrontoni, LASD Commander or Deputy; (18) A. Vasquez, LASD Deputy; and (19) Daniel Martinez, LASD Deputy. Id. at 3-5. He includes the LASD as a defendant in the caption. See id. at 1.

## III.
## SUMMARY OF ALLEGATIONS

Plaintiff's main complaint is that in 2013, prison officials forcefully extracted him from his cell when he refused to report to the mental health

---

[1] Plaintiff refers to each Defendant as an "LASD Deputy" when responding to the question, "Explain how this defendant was acting under color of law." See FAC at 2-9. It is unclear whether all or some of the defendants were deputies at the time of the alleged acts but have since been promoted.

2

ward without a court or doctor's order.

On March 28, 2013, the "county ombudsman" told Plaintiff that "credits" and "discrepancies from previous cases" would reduce his prison time. Id. at 14. On the same day—and as Plaintiff learned from later speaking with unidentified LASD officials—Alvarez, Taylor, Orenelas, and Peitrontoni discussed Plaintiff's possible early release and previous written threats Plaintiff had made against Los Angeles County law enforcement. Id. at 17. These four Defendants were concerned that Plaintiff would qualify for prison housing outside a "secured facility," with more resources to plan attacks on law enforcement. Id. They decided to obstruct Plaintiff's access to unsecured housing by giving him a "mental health stigma record." Id.

At some point on March 28, Taylor told Plaintiff that he had an assigned seat on the 10:00 p.m. bus to the Inmate Release Center, but that Plaintiff must spend at least one day in the jail mental health ward before going to prison. Id. at 18. Taylor stated that no doctor or judge had issued a "mental health order," and Plaintiff replied that he would not go to the mental health ward without such an order. Id.

On the morning of March 29, Felix told Plaintiff that he would be moved to the mental health ward; Plaintiff replied that he would "put up a good fight." Id. at 23. A short time later, Felix opened Plaintiff's tray slot. Id. at 25. After asking Felix to close the tray slot three times, Plaintiff "allegedly threw a milk carton full of urine, however, also allowed Felix to close the tray slot." Id. at 26.

Yoell then approached Plaintiff's cell and asked if he wanted to speak with Alvarez in the hallway. Plaintiff replied, "No I am not falling for that ruse." Id. Plaintiff asked Yoell to comply with a court order to transfer him to prison. Id. at 25-26. Yoell refused. Id. Plaintiff saw Yoell, Felix, and Vasquez gather at the end of the hallway. Id. at 26. He then saw Felix and Vasquez

3

walk toward the vents; they sprayed pepper spray into Plaintiff's cell four times each, saying, "Take that, how do you like us now?" Id. at 26-27. Yoell told them, "That is enough!" Id. at 27. The pepper spray caused Plaintiff a "mild" asthma attack. Id. at 22.

At about noon, Alvarez approached Plaintiff's cell with a video recorder and asked Plaintiff to exit the cell for a medical check-up. Id. at 29. Plaintiff said he would only do so if a doctor issued an "emergency order." Id. Alvarez asked if Plaintiff had any weapons, and Plaintiff said he did not. Id. Alvarez said that he, Peitrontoni, and Rojas were working to get a court order, but that regardless of whether the order came through, they would use force to extract Plaintiff from his cell. Id. at 30. Alvarez told Plaintiff that he was throwing Plaintiff's lunch away because of the problems Plaintiff had caused. Id.

One hour later, Peitrontoni approached Plaintiff's cell with a video recorder and asked Plaintiff to step out to be taken to the hospital. Id. Plaintiff asked why, and Peitrontoni replied, "Because it's my job." Id. at 31. Peitrontoni told Plaintiff that he could not sign a treatment refusal form and threatened to move Plaintiff to the mental health ward "at all costs." Id. Peitrontoni stated that he would make sure Plaintiff was not released early from prison. Id. at 32. Peitrontoni said that he had read letters written by Plaintiff and addressed to Peitrontoni, Alvarez, and other LASD officials; in these letters, Plaintiff wrote that he would seek revenge against officials who had "crossed him" and shoot them at their homes. Id. at 32-33. Peitrontoni stated that "public safety is paramount" and "when rules of law do not or cannot maintain order, then you have to make your own rules because anything else results in anarchy." Id. at 33. Peitrontoni also said that he would try to get an emergency order from various doctors and, if that failed, from the judge who had ordered Plaintiff's transfer, but was "dead set" on moving Plaintiff to the mental health ward. Id. at 34. As Peitrontoni walked away,

Plaintiff yelled that he would attempt to murder any official who tried to extract him from his cell without a court or doctor's order. Id. at 35.

At 3:00 p.m., Peitrontoni, Alvarez, and Rojas summoned Martinez, Machado, Allen, Nguyen, Quintana, Orlandos, Solomua, Halby and Chavez to a staff briefing room to discuss how to extract Plaintiff from his cell. Id. at 37, 42. The meeting was recorded. Id. Peitrontoni discussed Plaintiff's "windfall" of credits and the "very real possibility" of Plaintiff seeking revenge on them after his release. Id. at 43. Chavez suggested using a "ruse" to trick Plaintiff into going into the mental health ward, and Alvarez pointed out that in that case, they could not use leg irons on Plaintiff and he could kick them once he discovered the ruse. Id. at 43-44. Peitrontoni and Alvarez stated that Peitrontoni's attempts to obtain a doctor's or court order had failed, and that they were "on their own." Id. at 46. Peitrontoni made one last attempt to contact "the judge," who did not return his voicemail. Id.

After this meeting, Rojas approached Plaintiff's cell and ordered him to cuff up to be "medically cleared." Id. at 46. Plaintiff "stood his ground." Id. Rojas pepper sprayed Plaintiff, and Machado shot him with rubber bullets. Id. at 42, 46. Martinez called over his radio to open Plaintiff's cell door. Id. at 46. Plaintiff "barged out and attacked whoever was in his path" to "disable whoever he could in order to gain control of a weapon." Id. at 47. Martinez, Allen, Nguyen, Quintana, and Orlandos began to punch Plaintiff, Solomua twisted and broke Plaintiff's left arm while he was on the ground, and Plaintiff was knocked out. Id.

At some point, Haley and Chavez "yanked on Plaintiff's arm" while moving him onto an X-ray table. Id. at 48. When Haley used a "mockery tone," Plaintiff said, "Fuck you bitch, you think you can punk me while I am in pain?? Fuck you and everything you stand for." Id. Haley said, "All I have to do is this" and he poked Plaintiff's broken arm. Id. Chavez told Plaintiff,

5

"take deep breaths, as if you are having a baby," while watching Haley and laughing. Id.

By 6:00 p.m., Plaintiff was at the Los Angeles County Medical Center. Id. The doctor told Plaintiff that he would not need surgery if his arm was immediately cast. Id. at 49. Plaintiff pretended to sleep and overheard Glynn and Campos discussing whether Plaintiff could make a weapon from a piece of fiber glass, and Campos told Glynn to talk to the doctor about not casting Plaintiff's broken arm. Id. Glynn took the doctor aside and spoke to him privately. Id. Five minutes later, the doctor told Plaintiff that he would be placed in a splint to await a special brace in two weeks. Id. The doctor said that the deputies were concerned that Plaintiff would make a shank from the fiberglass, and that Glynn had ordered him not to cast the arm. Id. at 49-50. As a result of the delay, Plaintiff's arm did not heal properly and he needed surgery. Id. at 50.

After seeing the doctor, Plaintiff returned to jail and was put into a cell for five days, naked. Id. "LASD Deputies" told him that this was punishment for trying to murder deputies. Id.

According to Plaintiff, at the time of these events, he had a "K-10" housing classification with an "H tag," meaning that he was a danger to others; he debates that he was a danger to himself. Id. at 21-22. According to Plaintiff, the Jail Mental Health Evaluation Team has a policy that a doctor must personally evaluate a prisoner before using force to comply with a movement order. Id.

As a result of the cell extraction described in the FAC, Plaintiff was convicted of three counts of attempted premeditated murder, eight counts of assault, one count of weapon possession, and one count of battery in relation to this incident. See People v. Avila, No. B257654, 2016 WL 1403983, at *3-6 (Cal. Ct. App. Apr. 8, 2016). Plaintiff claims that Alvarez and Peitrontoni

6

deleted certain recordings that would have been "exculpatory" and shown that Plaintiff was "entrapped." Id. at 36, 38.

## IV.
## STANDARD OF REVIEW

The Court's screening of the FAC under the foregoing statutes is governed by the following standards: A complaint may be dismissed for failure to state a claim for two reasons: (1) lack of a cognizable legal theory; or (2) insufficient facts under a cognizable legal theory. Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1990). In determining whether the complaint states a claim on which relief may be granted, its allegations of material fact must be taken as true and construed in the light most favorable to Plaintiff. Love v. United States, 915 F.2d 1242, 1245 (9th Cir. 1989). Since Plaintiff is appearing pro se, the Court must construe the allegations of the complaint liberally and afford Plaintiff the benefit of any doubt. Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 623 (9th Cir. 1988). However, "the liberal pleading standard . . . applies only to a plaintiff's factual allegations." Neitzke v. Williams, 490 U.S. 319, 330 n.9 (1989). "[A] liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled." Bruns v. Nat'l Credit Union Admin., 122 F.3d 1251, 1257 (9th Cir. 1997) (quoting Ivey v. Bd. of Regents, 673 F.2d 266, 268 (9th Cir. 1982)). A "plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (holding that to avoid dismissal for failure to state a claim, "a complaint must

contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." (citation omitted)).

If the Court finds that a complaint should be dismissed for failure to state a claim, the Court may dismiss with or without leave to amend. Lopez v. Smith, 203 F.3d 1122, 1126-30 (9th Cir. 2000) (en banc). The Court should grant leave to amend if it appears possible that the defects in the complaint could be corrected, especially if a plaintiff is pro se. Id. at 1130-31; see also Cato v. United States, 70 F.3d 1103, 1106 (9th Cir. 1995) (noting that "[a] pro se litigant must be given leave to amend his or her complaint, and some notice of its deficiencies, unless it is absolutely clear that the deficiencies of the complaint could not be cured by amendment"). However, if, after careful consideration, it is clear that a complaint cannot be cured by amendment, the Court may dismiss without leave to amend. Cato, 70 F.3d at 1105-06.

## V.
## DISCUSSION

### A. Plaintiff's Failure to Allege Personal Involvement By Ornelas or Taylor

In order to state a § 1983 claim, Plaintiff must allege that particular defendants personally participated in the alleged rights deprivations. See Jones v. Williams, 297 F.3d 930, 934 (9th Cir. 2002). Plaintiff's only allegation against Taylor is that he told Plaintiff that Plaintiff needed to go to the mental health ward. Plaintiff makes no particularized allegations at all against Ornelas. To the extent Plaintiff bases his claims on Ornelas's role as a supervisor, he fails to state sufficient facts to support those legal theories. Supervisory personnel generally are not liable under 42 U.S.C. § 1983 on any theory of respondeat superior or vicarious liability, in the absence of a state law

8

imposing such liability. See Redman v. Cty. of San Diego, 942 F.2d 1435, 1446 (9th Cir. 1991). A plaintiff must allege either (1) the supervisor's personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation. Starr v. Baca, 652 F.3d 1202, 1207 (9th Cir. 2011). Here, Plaintiff has done neither. Accordingly, Plaintiff's claims against Ornelas and Taylor are subject to dismissal.

**B.     Plaintiff's *Heck*-Barred Claims**

In Heck v. Humphrey, 512 U.S. 477 (1994), the United States Supreme Court addressed "whether a state prisoner may challenge the constitutionality of his conviction under 42 U.S.C. § 1983," id. at 478, and held:

> [T]o recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus. . . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.

Id. at 486-87; see also Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005) (holding that Heck doctrine applies regardless of type of relief sought if success in action would necessarily demonstrate invalidity of confinement or its duration).

Plaintiff's claims regarding the "exculpatory" deleted recordings are Heck-barred. Plaintiff was convicted of attempted premeditated murder, assault, weapon possession, and battery in relation to the cell extraction. See Avila, 2016 WL 1403983, at *3-6. Plaintiff seeks damages arising from Alvarez's and Peitrontoni's alleged deletion of exculpatory evidence, and

according to Plaintiff, these tapes would have shown his innocence. Judgment in favor of Plaintiff would undermine the validity of his conviction. Therefore, such claims may not be brought in a § 1983 action unless he establishes that the conviction has been invalidated.

### C. Plaintiff's First Amendment Claims

Plaintiff accuses various defendants of violating his First Amendment rights. First, he claims that Yoell, Felix, and Vasquez violated his First Amendment right to refuse to be associated with the mental health system. See FAC at 19. The First Amendment protects the right of the people peaceably "to assemble." U.S. Const. amend. I. Plaintiff argues that that the First Amendment guarantees him the right not to "be associated with" mental health problems—i.e., to be free of a stigma. The right to be free of the "stigma" of mental health treatment has nothing to do with the right to assemble under the First Amendment.

Plaintiff also claims that (1) Yoell, Felix, and Vasquez retaliated against him for refusing to go to the mental health ward, by pepper spraying him and falsely accusing him of throwing urine on Felix, and (2) Alvarez and Peitrontoni retaliated against him for getting a "windfall of credits" and refusing their monthly attempts to voluntarily move to the mental health ward. FAC at 19-20, 27-28. In the prison context, a First Amendment retaliation claim has five basic elements: "(1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." Rhodes v. Robinson, 408 F.3d 559, 567–68 (9th Cir. 2005).

///
///
///

Although the Court is skeptical of Plaintiff's retaliation claims,[2] Plaintiff does allege that Defendants wanted to place him in the mental health ward to "stigmatize" him, not to advance a legitimate correctional goal. Also, there "may be a First Amendment right not to participate in treatment," meaning it is at least possible that Plaintiff's refusal to go to the mental health clinic was protected conduct. Hydrick v. Hunter, 500 F.3d 978, 991 (9th Cir. 2007) (addressing motion to dismiss where sex offender plaintiffs argued that they had First Amendment right to refrain from saying they have an illness and to refuse to participate in treatment), cert. granted, judgment vacated on other grounds, 556 U.S. 1256 (2009). But, to the extent Plaintiff claims that any Defendant retaliated against him for threatening to and trying to murder them, threatening and attempting to murder prison officials is not conduct protected by the First Amendment. It is well-settled that the Constitution does not protect true threats. See Virginia v. Black, 538 U.S. 343, 359–360 (2003).

**D.    Plaintiff's Due Process Claims**

Plaintiff claims that Yoell, Felix, Vasquez, Alvarez, and Peitrontoni violated his due process right to refuse mental health treatment. FAC at 19, 29-33. "The Fourteenth Amendment provides that no State shall 'deprive any person of life, liberty, or property, without due process of law.' The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from … prior [U.S. Supreme Court] decisions." Cruzan by Cruzan v. Dir., Missouri Dep't of Health, 497 U.S. 261, 278 (1990). Despite the FAC's many deficiencies, and assuming that Plaintiff was "competent," the Court is reluctant to dismiss Plaintiff's due process claims at the screening stage.

---

[2] For example, Plaintiff does not explain how Alvarez's depriving him of lunch on one occasion chilled Plaintiff's First Amendment rights.

### E. Plaintiff's Eighth Amendment Claims

Plaintiff claims that Felix, Yoell, Alvarez, Peitrontoni, Rojas, Machado, Martinez, Allen, Nguyen, Quintana, Orlandos, Solomua, Haley, and Chavez used excessive force against him to attempt to extract him from his cell. FAC at 19-20, 37. The Eighth Amendment bars using excessive physical force against inmates. Farmer v. Brennan, 511 U.S. 825, 832 (1994). To prevail on an Eighth Amendment excessive force claim, the plaintiff must show that the force used against him was not "applied in a good faith effort to maintain or restore discipline[, but rather] maliciously and sadistically for the very purpose of causing harm." Whitley v. Albers, 475 U.S. 312, 320-21 (1986).

By his own admission, Plaintiff stated that he would "put up a good fight" and threatened to murder any prison official who attempted to extract him from his cell without a court or doctor's order referring Plaintiff for mental health treatment. He has not explained why the Court should not conclude that any force used to extract him was applied in a good faith effort to maintain or restore discipline, rather than maliciously and sadistically. For this reason alone, the Court is inclined to reach the conclusion that Plaintiff's excessive-force claims related to his cell-extraction should be dismissed.

Looking past the cell extraction, Plaintiff has arguably stated a claim of excessive force for Haley's actions in touching his broken arm to cause him pain. See Farmer, 511 U.S. at 834 (noting that Eighth Amendment excessive force claimants must show that officials acted maliciously and sadistically for the purpose of causing harm). By contrast, Plaintiff does not state an Eighth Amendment claim against Glynn and Campos. The Eighth Amendment prohibits only the "unnecessary and wanton infliction of pain." Farmer, 511 U.S. at 834. Based on the FAC, Glynn and Campos acted to ensure that Plaintiff would receive a special brace, rather than a cast that he could use as a weapon; given Plaintiff's admissions of violent conduct, this was not deliberate

12

indifference, but a reasonable safety precaution. Finally, Plaintiff may state a deliberate indifference claim if he was in fact placed naked into a cell for five days. See Farmer, 511 U.S. at 832 (noting that the Eighth Amendment requires that officials provide humane conditions of confinement). However, Plaintiff does not explain who placed him in the cell or who said that this was punishment for trying to murder deputies. As for Alvarez throwing away Plaintiff's lunch on one occasion, this does not amount to "inhumane" conditions of confinement.

**F.     Plaintiff's Claims against the LASD**

Section 1983 provides, in relevant part, that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage ... subjects ... any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party." 42 U.S.C. § 1983. "The term 'persons' encompasses state and local officials sued in their individual capacities, private individuals, and entities which act under the color of state law and local governmental entities." Vance v. Cty. of Santa Clara, 928 F. Supp. 993, 995-96 (N.D. Cal. 1996). However, the LASD is a municipal department within Los Angeles County, and thus is not as a general matter considered a "person" within the meaning of § 1983. See United States v. Kama, 394 F.3d 1236, 1239 (9th Cir. 2005) (Ferguson, J. concurring) ("[M]unicipal police departments and bureaus are generally not considered 'persons' within the meaning of Section 1983."); Rodriguez v. Cty. of Contra Costa, No. C 13-2516, 2013 WL 5946112, at *3 (N.D. Cal. Nov. 5, 2013). Therefore, to the extent that Plaintiff seeks to hold LASD liable under § 1983, his claims are defective.

Assuming that Plaintiff meant to Los Angeles County (the "County") as a defendant, municipalities are "persons" subject to liability under 42 U.S.C. § 1983 where official policy or custom causes a constitutional tort. See Monell v.

Dep't of Social Servs., 436 U.S. 658, 690 (1978). However, the County "may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is only when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Id. at 694 (1978). Thus, the County may not be held liable for the alleged actions of its employees or agents unless "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by that body's officers," or if the alleged constitutional deprivation was "visited pursuant to a governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." Id. at 690-91.

Here, Plaintiff has failed to identify any policy statements or regulations of the County, or any officially adopted or promulgated decisions, the execution of which inflicted the alleged injuries. He has also not alleged sufficient facts for the Court to "draw the reasonable inference" that the County has a governmental custom of committing the illegal acts alleged. The Court therefore concludes that Plaintiff has failed to allege sufficient facts for the Court to "draw the reasonable inference" that the County has a custom of engaging in the kind of illegal conduct that Plaintiff alleges occurred here. See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996) ("Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy.").

///
///
///

# VI.
# CONCLUSION

Because of the pleading deficiencies identified above, the FAC is subject to dismissal. Because it appears to the Court that some of the FAC's deficiencies are capable of being cured by amendment, it is dismissed with leave to amend. See Lopez, 203 F.3d at 1130-31 (holding that pro se litigant must be given leave to amend complaint unless it is absolutely clear that deficiencies cannot be cured by amendment). If Plaintiff still desires to pursue his claims against Defendants, he shall file a Second Amended Complaint within thirty-five (35) days of the date of this Order remedying the deficiencies discussed above. Plaintiff's Second Amended Complaint should bear the docket number assigned in this case; be labeled "Second Amended Complaint"; and be complete in and of itself without reference to the original Complaint or any other pleading, attachment or document. The Clerk is directed to send Plaintiff a blank Central District civil rights complaint form, which Plaintiff is strongly encouraged to utilize.

**Plaintiff is admonished that, if he fails to timely file a Second Amended Complaint, the Court will recommend that this action be dismissed with prejudice for failure to diligently prosecute.**

Dated: June 21, 2017

_____
DOUGLAS F. McCORMICK
United States Magistrate Judge